Joseph H. Harrington
Acting United States Attorney
Eastern District of Washington
Stephanie Van Marter
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 04, 2021

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 4:19-CR-06061-SAB-1 |
| v. | |
| JULIO LEAL PARRA, | PLEA AGREEMENT |
| Defendant. | |

Plaintiff, United States of America, by and through Joseph H. Harrington, Acting United States Attorney for the Eastern District of Washington, and Stephanie Van Marter, Assistant United States Attorney for the Eastern District of Washington, and Defendant JULIO LEAL PARRA, and the Defendant's counsel, Chris Black, agree to the following Plea Agreement:

1.    Guilty Plea and Maximum Statutory Penalties:

The Defendant, JULIO LEAL PARRA, agrees to enter a plea of guilty to the Indictment filed on October 17, 2019, charging the Defendant with Conspiracy to Distribute 50 Grams or More of Actual Methamphetamine, 5 Kilograms or more of Cocaine and 1 Kilogram or more of Heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(i)(ii) and (viii) and 21 U.S.C. § 846.

Plea Agreement - 1

The Defendant, JULIO LEAL PARRA, understands that the charge contained in the Indictment is a Class A felony charge and that the maximum statutory penalty is not less than 10 years imprisonment, which is non-suspendable and non-parolable, and a maximum possible penalty of life imprisonment; a fine not to exceed $10,000,000; a term of supervised release of not less than 5 years up to a life term; denial of certain federal benefits; and a $100 special penalty assessment.

The Defendant, JULIO LEAL PARRA, further understands that a violation of a condition of supervised release carries an additional penalty of re-imprisonment for all or part of the term of supervised release without credit for time previously served on post-release supervision.

    2.    <u>Denial of Federal Benefits:</u>

The Defendant understands that by entering this plea of guilty the Defendant is no longer eligible for assistance under any state program funded under part A of title IV of the Social Security Act (concerning Temporary Assistance for Needy Families) or benefits under the food stamp program or any state program carried out under the Food Stamp Act. 21 U.S.C. § 862a. Further, the Court may deny the Defendant's eligibility to any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States.  21 U.S.C. § 862.

    3.    <u>The Court is Not a Party to the Agreement:</u>

The Court is not a party to this Plea Agreement and may accept or reject this Plea Agreement. Sentencing is a matter that is solely within the discretion of the Court. The Defendant understands that the Court is under no obligation to accept any recommendations made by the United States and/or by the Defendant; that the Court will obtain an independent report and sentencing recommendation

Plea Agreement - 2

from the U.S. Probation Office; and that the Court may, in its discretion, impose any sentence it deems appropriate up to the statutory maximums stated in this Plea Agreement.

The Defendant acknowledges that no promises of any type have been made to the Defendant with respect to the sentence the Court will impose in this matter. The Defendant understands that the Court is required to consider the applicable sentencing guideline range, but may depart upward or downward under the appropriate circumstances.

The Defendant also understands that should the sentencing judge decide not to accept any of the parties' recommendations, that decision is not a basis for withdrawing from this Plea Agreement or a basis for withdrawing his plea of guilty.

4.    Effect on Immigration Status:

The Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the Defendant is pleading guilty. Indeed, because the Defendant is pleading guilty to a Conspiracy to Distribute Methamphetamine, removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that while deportation and/or removal appears to be a virtual certainty, no one, including his attorney or the district court, can predict with absolute certainty the effect of his conviction on his immigration status. The Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if automatic removal from the United States is a virtual certainty.

Plea Agreement - 3

5.    <u>Waiver of Constitutional Rights</u>:

The Defendant, JULIO LEAL PARRA, understands that by entering this plea of guilty the Defendant is knowingly and voluntarily waiving certain constitutional rights, including:

(a).    The right to a jury trial;

(b).    The right to see, hear and question the witnesses;

(c).    The right to remain silent at trial;

(d).    The right to testify at trial; and

(e).    The right to compel witnesses to testify.

While the Defendant is waiving certain constitutional rights, the Defendant understands the Defendant retains the right to be assisted through the sentencing and any direct appeal of the conviction and sentence by an attorney, who will be appointed at no cost if the Defendant cannot afford to hire an attorney. The Defendant also acknowledges that any pretrial motions currently pending before the Court are waived.

6.    <u>Elements of the Offenses</u>:

The United States and the Defendant agree that in order to convict the Defendant of Conspiracy to Distribute 50 Grams or More of Actual Methamphetamine, 5 Kilograms or more of Cocaine and 1 Kilogram or more of Heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(i)(ii) and (viii), the United States would have to prove beyond a reasonable doubt the following elements:

> *First*, on a date unknown but by on or about December 2016 continuing until on or about October 16, 2019, in the Eastern District of Washington, the Defendant, entered into an agreement with one or more persons to commit the crime of Distribution of

Plea Agreement - 4

Methamphetamine, an/or Cocaine and/or Heroin, as charged in the Indictment;

Second, the Defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

Third, the agreement was to distribute 50 Grams or More of actual Methamphetamine, 5 Kilograms or More of Cocaine 1, and/or 1 Kilogram or more of Heroin, which would be reasonably foreseeable to him as a member of the conspiracy.

7.    Factual Basis and Statement of Facts:

The United States and the Defendant stipulate and agree that the following facts are accurate; that the United States could prove these facts beyond a reasonable doubt at trial; and these facts constitute an adequate factual basis JULIO LEAL PARRA's guilty plea. The parties acknowledge there are global facts pertaining to the overall conspiracy included within this factual statement to which the Defendant may not have personal knowledge.  However, the Defendant agrees and stipulates that the facts as they pertain directly to his involvement in the overall conspiracy, are accurate with one exception. The Defendant reserves the right to challenge some of the statements of the cooperators/defendants referenced herein.  This statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts which are relevant to the guideline computation or sentencing, unless otherwise prohibited in this agreement.

---

1 The Defendant denies being directly involved in arranging for or distributing cocaine as a part of this conspiracy but admits to the other controlled substances, therefore, agrees this does not impact the application of the sentencing guidelines.

Plea Agreement - 5

Members of the FBI Southeast Washington Safe Streets Task Force (SWSSTF) have been investigating Julio Leal PARRA, the Defendant, and his role in drug trafficking since March 2018. During the investigation, through a number of cooperator interviews, enforcement actions and review of physical evidence, the Defendant was identified as a manager/supervisor for the organization who was responsible for coordinating large shipments of controlled substances to include methamphetamine, cocaine, and heroin to be transported to the Eastern District of Washington. The Defendants would then utilize several people to transport and distribute the product to various location throughout the district to include Spokane WA. The Defendant would then arrange for the collection of cash drug proceeds and to transport those cash drug proceeds back to the organizations source of supply. The following is a timeline of events as it pertains to the identification of members of this organization.

## 2016 ARREST OF CO-DEFENDANT ESCARCIGA

On December 9, 2016, the St. Louis Division of the DEA became involved in an investigation after a traffic stop and arrest of the nephew of Leal PARRA, Co-Defendant Kevin Escarciga. On that date, DEA Task Force Officers were conducting patrol pursuant to the OCDETF Highway Interdiction Initiative in St. Charles County, MO. During this patrol they stopped a 2016 Nissan Maxima, bearing Washington license AZP6819. The vehicle was registered to the Defendant at 933 S. 4th Lane in Pasco, WA. The driver of the vehicle was identified as Kevin Alberto Escarciga (ESCARCIGA). The passenger was identified as Alexandro Zazueta (ZAZUETA).

A police K9 conducted a free air sniff of the vehicle and alerted for the presence of narcotics. A consent search of the vehicle discovered approximately two kilograms of heroin and five kilograms of cocaine. ZAZUETA provided a

Plea Agreement - 6

post-Miranda statement to officers. ZAZUETA stated that he and ESCARCIGA were transporting the drugs for ESCARCIGA'S uncle, the Defendant. ZAZUETA admitted to traveling with ESCARCIGA from Pasco, WA to Phoenix, AZ where the drugs were placed into the vehicle. The two were enroute to Kentucky when they were stopped. ESCARCIGA did not provide a statement to officers.

On April 17, 2017 ESCARCIGA and ZAZUETA both pled guilty to one count of Conspiracy to Distribute and Possess with Intent to Distribute Cocaine in the Eastern District of Missouri (4:16-cr-00535-CEJ) and on July 10, 2017, Escarciga was sentenced to 18 months in prison. Escarciga returned illegally to the Tri-Cities area within months of his deportation to Mexico and was witnessed multiple times on surveillance by FBI agents as well as identified as being actively engaged in drug trafficking with the Defendant by multiple witnesses. Escarciga (Leal) was with the Defendant at his Benton city residence in October 2019, the day of their arrest in this matter.

During this same time period, FBI engaged in a separate and later learned related investigation, beginning December 2017. This investigation originated from the Cross Border Violence Task Force (CBVTF) out of southern California. *See*, 4:18-CR-06008-EFS-2. After identifying a high ranking member of that organization an undercover began to engage in recorded conversation with that target. During the course of those conversations, the target indicated there was a cell operating in the Tri-Cities area that would be in needs of the offered money laundering services of the undercover. As a result, that target provided the undercover with the Defendant's telephone number to make arrangements for several money drops. Between December 2017 and February 9, 2018, the Defendants in that case participated in several cash money drops of drug cash

Plea Agreement - 7

proceeds totaling over 1 million dollars cash to include over $120,000 cash seized at the time of execution of search warrants on February 14, 2018. During the execution of search warrants for various locations, law enforcement seized almost 70 pounds of cocaine, heroin and methamphetamine plus an additional 40,000 Fentanyl pills. Co-located with the large shipment of narcotics, was a bag of loaded firearms. These firearms were very distinctive with their own gold plated emblems.

Law enforcement also seized a number of drug ledgers, indicia belonging to those defendants as well as numerous cellular telephones. It was during the exploitation of these cellular phones that FBI identified direct communications between the Defendant and a confirmed telephone utilized by him and Co-Defendant Reynaldo Munoz, the identified leader organizer of that drug organization cell operating here in the district. This connection was later confirmed as will be noted below, by CD1.

**ARREST OF COOPERATING WITNESS 1 (CW1) AND COOPERATING DEFENDANT 1 (CD1)**

On March 10, 2018, CW1 and CD1 were arrested on multiple charges following a police response to an open 911 line and a possible disturbance. CW1 gave officers consent to search their vehicle. Outside of the vehicle, hidden in the front passenger side wheel well, officers found a bag that contained approximately 245.7g (1/2 pound) of cocaine. During a search of the interior of the vehicle, officers located approximately 39.2g of cocaine and 29.9g of methamphetamine. In addition to the drugs officers found four firearms described as a Taurus Millennium G2 9mm handgun, a Bersa .380 handgun, a Ruger .44 Magnum handgun, and a Mossburg 715T .22 rifle. CW1 was personally in possession of an additional 32.4g of methamphetamine.

Plea Agreement - 8

During a post-Miranda interview, CD1 admitted that the drugs were being transported to the Eastern District of Washington for distribution.

### *Interview of CW1*

CW1 identified an individual (hereinafter identified as CD1) as a transporter of methamphetamine and heroin from California to the Tri-Cities, WA. CD1 then sold the narcotics in Spokane, WA. CD1 worked for a male, nicknamed "TIO", who owned an upholstery shop located across from the grain silos on Clearwater Ave in Kennewick, WA. CW1 reported that "TIO" also owned a converted apartment building near the intersection of 1st Ave and Washington St. in Kennewick. CW1 advised he/she never personally met "TIO". CW1 reported that CD1 was assisted in the transportation, packaging, and selling of the narcotics by three other people, hereinafter identified as CD2, CD3, and Co-Defendant, BIANCA ORTEGA. CW1 reported that CD1 transported multiple pounds of narcotics a month from California to the Tri-Cities for the DTO.

CW1 reported that CD1 made almost daily trips from the Tri-Cities to Spokane to transport narcotics and had a few specific clients. One of these clients was known to CW1 as "PRIMERA."[2] CW1 described "PRIMERA" as an older female with connections at Northern Quest Casino. "PRIMERA" occasionally provided CD1 with rooms at the Casino. Following the sale of the narcotics, CD1 returned with the money to the Tri-Cities and provide it to "TIO". CW1 knew this information because CW1 accompanied CD1 on some of these trips.

Based upon the description provided by CW1, and familiarity with the area, investigators were able to determine the upholstery shop referred to by CW1 to be Perfect Design Upholstery, located at 6719 W. Clearwater Ave in

---

[2] PRIMERA was later positively identified as Co-Defendant HAMILTON.

Plea Agreement - 9

Kennewick, and the converted apartment (which had been the previous location for Perfect Design Upholstery) to be 17 E. 1st Ave in Kennewick. The Washington State Department of Revenue's website listed the legal name for Perfect Design Upholstery as Leal Enterprises, LLC and one of the governing people as JULIO LEAL PARRA. A local police database and the Benton County Assessors website listed the owner of 17 E. 1st Ave as JULIO LEAL PARRA. The Washington driver's license for LEAL PARRA lists his residential address as 933 S. 4th Ln. in Pasco. TFO Brazeau recognized this as the same address for the vehicle from ESCARCIGA's 2016 DEA arrest in Missouri. It appeared, based upon this cumulative information, that "TIO" and LEAL PARRA are the same person. This presumption was later confirmed and is detailed further in the affidavit.

On May 1, 2018 CW1 was interviewed a second time by SA Grover and TFO Brazeau. CW1 identified a photo of Co-Defendant, Bianca Ortega Hernandez, absent any identifiers, as the "Bianca" mentioned in the earlier interview. CW1 identified a photo of 17 E. 1st Ave, absent any identifiers, as the converted apartment owned by "TIO". CW1 identified a photo of 6719 W. Clearwater Ave, absent any identifiers (aside from the business sign), as the business owned by "TIO".

### *Interview of CD1*

On November 29, 2018, TFO Brazeau conducted an interview with CD1 regarding the Defendant and the DTO. CD1 was in prison for felony drug related crimes. CD1 is a United States citizen. CD1 agreed to cooperate with investigators for consideration of not being indicted in the criminal conspiracy. No promises were made to CD1. A subsequent interview was conducted with

Plea Agreement - 10

CD1. The information that CD1 provided in the different interviews was generally consistent. The following is a summary of the information provided.

CD1 moved to the Tri-Cities, WA for the purpose of working for the Defendant and the DTO in late 2016. CD1 advised they were recruited into the DTO by the Defendant. CD1 stated he/she began by making almost daily trips between the Tri-Cities, WA and Spokane, WA to deliver drugs for and at the direction of the Defendant throughout 2017 and 2018. CD1 advised that he/she primarily delivered to the same people in Spokane, WA and identified them by their nicknames as "CHICA", "FLACO", "LUKE" and "PRIMERA". CD1 was shown photos of the four Spokane, WA customers, all absent any identifiers. CD1 identified and confirmed that Co-Defendant VILLA was known as "CHICA", A.J. WELLING was known as "FLACO", Aryn JENNEN was known as "LUKE", and Co-Defendant HAMILTON was known as "P" or "PRIMERA".

CD1 transported about one pound of methamphetamine, cocaine, and a few ounces of heroin to Spokane, WA daily. The largest amount CD1 transported to Spokane was about 20 pounds of methamphetamine and ½ - 1 kilogram of cocaine at one time. CD1 was provided the bulk drugs for transport from various people working for the Defendant, to include Co-Defendant ESCARCIGA. The bulk drugs were kept in various storage units in the Tri-Cities, WA prior to transport. CD1 would return from Spokane with money from the drug sales. The amounts were typically $20,000 - $40,000. CD1 was paid $5,000 every two weeks by the Defendant. CD1 identified a subject later referred to as CD2 and Co-Defendant Bianca Ortega as also being recruited by the Defendant to transport drugs for his organization.

CD1 positively identified a photo of the Defendant, LEAL PARRA, absent any identifiers, as JULIO LEAL, AKA: "TIO". CD1 identified a photo of

Plea Agreement - 11

ESCARCIGA, absent any identifiers, as "KEVIN LEAL", a nephew of LEAL PARRA. CD1 also identified photos of Bianca Ortega, CD2 as well as 17 E 1st Ave and 6719 W Clearwater Ave in Kennewick as buildings owned by the Defendant.

CD1 also advised that when CD1 began to work for the DTO, CD1 provided the Defendant with photo identifications, social security numbers, addresses, and/or passports for family members. CD1 advised this was done to send a message in the event CD1 was ever arrested so that CD1 would not cooperate with law enforcement. CD1 expressed fear of the Defendant based upon his role and status in the organization as well as the Defendant's direct ties to the bosses in Mexico.

In a follow up interview with CD1, CD1 confirmed the connection between the Defendant and Reynaldo MUNOZ.

*Surveillance May-June 2018*

In response to several of the above events, in May 2018, TFO Brazeau conducted a physical surveillance of 17 E. 1st Ave in order to identify and corroborate information obtained thus far. TFO Brazeau observed a 2009 Kia Spectra, bearing Washington license AOU3357, registered to Bianca Ortega, parked along the west side of the building. Co-Defendant Ortega was observed in the driver seat of the vehicle and CD2 was positively identified as the passenger. The two exited the vehicle and entered into the main door for the apartments. This was consistent with information provided by CW1 and CD1.

During the initial stages of the investigation, notably late March–early May, TFO Brazeau also frequently observed a 2011 Shelby Mustang, bearing WA license BFK6245, parked in front of Perfect Design Upholstery. The vehicle was often parked near the front door of the business parallel to the sidewalk. This

Plea Agreement - 12

is not a normal parking stall for the business. It was a very conspicuous location and, primarily due to its bright red color, easy to notice.

On May 16, 2018 TFO Brazeau observed Co-Defendant Ortega and CD2 drive away from 17 E. 1st Ave in the Kia Spectra. Visual surveillance was maintained on the vehicle until it drove into the area of Craft Warehouse located at 7411 W. Canal Dr. in Kennewick. SA Grover observed that the Kia was being followed by the 2011 Shelby Mustang mentioned above. TFO Sgt. Moos observed Co-Defendant Ortega park the Kia alongside the Shelby Mustang in the parking lot. TFO Sgt. Moos observed Co-Defendant Ortega exit the passenger side of the Shelby Mustang carrying a large purse that appeared full. The two vehicles separated and drove in different directions. TFO Sgt. Moos observed the same mustang parked back in front of Perfect Design Upholstery about ten minutes after it had left the meeting with Ortega and CD2. TFO Brazeau observed Ortega arrive at 17 E. 1st Ave about ten minutes after the Shelby Mustang was located.

On May 22, 2018 TFO Brazeau again conducted a physical surveillance at Perfect Design Upholstery. The 2011 Shelby Mustang was seen parked in front of the business. TFO Brazeau observed the Defendant exit the front door of the business talking on a telephone.

In an attempt to locate a valid residential address for LEAL PARRA TFO Brazeau reviewed public documents from the Washington Secretary of State website for Leal Enterprises LLC. These documents included an address for JULIO LEAL as 43405 N. 280 PR NE in Benton City, WA. A public records search of 43405 N. PR NE confirmed the owner of the residence to be JULIO LEAL.

Plea Agreement - 13

On June 1, 2018 TFO Brazeau conducted a physical surveillance of 43405 N. PR NE. TFO Brazeau observed the 2011 Shelby Mustang parked in the driveway. LEAL PARRA was seen in the front yard. A short time later a Hyundai Sonata drove away from the residence. Surveillance was maintained on the vehicle until it arrived at Perfect Design Upholstery. LEAL PARRA exited the passenger side of the vehicle and entered the business.

Based upon multiple inquiries after this point in time, it was confirmed that the Defendant utilized multiple vehicles throughout the investigation, many of which are not registered in his name. The above referenced Shelby Mustang is in the name of an employee of Perfect Design but this person was never observed driving that vehicle.

*Arrest and Interview of Cooperating Defendant 3 (CD3)*

On March 9, 2018, CD3 was arrested following a traffic enforcement stop. Based upon the events of the stop, CD3 was removed from the vehicle for further investigation n patted down for officer safety. CD3 volunteered he had a meth pipe and a small amount of meth in his pocket. Post Miranda the Defendant admitted there were drugs inside his vehicle. A PC search occurred and approximately 14.7 pounds of methamphetamine and a small amount of cocaine were located in the vehicle. CD3 was also in possession of a loaded Bryco Jennings 9mm handgun. During a later interview with TFO Brazeau, CD3 admitted that these drugs were being transported to the Eastern District of Washington at the direction of the Defendant.

On November 14, 2018 TFO Brazeau conducted an interview with CD3 regarding the Defendant and the DTO. CD3 was in prison on felony drug related crimes. CD3 is a United States citizen and had no prior felony convictions. CD3

Plea Agreement - 14

agreed to cooperate with investigators for consideration of not being indicted in the criminal conspiracy. No promises were made to CD3.

CD3 advised she/he moved to the Tri-Cities, WA around August 2017 for the purpose of working for the Defendant and the DTO. CD3 was introduced into the DTO by a current member at the time. CD3 knew the local leader of the DTO to be nicknamed "TIO" and to have a true first name of "Julio". CD3 identified two photos of the Defendant, LEAL PARRA, absent any identifiers, as "TIO".

When CD3 was being considered to work for the DTO, LEAL PARRA gathered personal information about CD3's family, like their names and addresses. This information was taken by LEAL PARRA. CD3 has not seen that information since it was passed to LEAL PARRA. CD3 believed LEAL PARRA retained the information in the event that CD3 ever stole drugs or cooperated with law enforcement.

CD3 began by transporting narcotics to Spokane, WA from the Tri-Cities, WA almost daily for the Defendant. CD3 also knew Co-Defendant Ortega and CD2 to transport drugs to Spokane, WA for the Defendant. CD3 typically delivered a few pounds of methamphetamine and smaller amounts of cocaine and heroin to the same small group of clients previously identified by CD1. CD3 identified photos of HAMILTON, JENNEN, VILLA, and WELLING, all absent any identifiers, as four of the primary Spokane customers. Following many trips to Spokane, CD3 returned with cash proceeds and provide them directly to the Defendant.

CD3's role in the DTO eventually changed to where CD3 was making trips to Arizona and California to pick up narcotics. The Defendant paid CD3 about $2,000 to make the trips and also provided $25,000 - $30,000 to pay for the drugs. LEAL PARRA directed CD3, via text and/or telephone call, to specific

Plea Agreement - 15

locations to pick up the drugs. CD3 made 5-10 of these trips for the Defendant. This was also confirmed upon a download of CD3's cell phone.

*Arrest of Cooperating Defendant 2*

TFO Brazeau through obtaining search warrants of telephones and listening to jail telephone calls, identified CD2 and a phone number she/he was utilizing. Based upon the information it appeared CD2 had taken over the role as another transporter for the organization after CD1 and CW1's arrest. On July 25, 2018, the Honorable U.S. Magistrate Judge Mary K. Dimke, Eastern District of Washington, signed a warrant authorizing the disclosure of real time location information for this telephone (4:18-mj-07145-MKD). That same day, TFO Brazeau began to monitor the telephone data.

On August 9, 2018, the location information for the phone showed it leaving the area of CD2's identified residence in Kennewick, Washington. The ping data reported that the phone was traveling south into Oregon and California. The ping data showed that the phone travelled into California as far south as the area of Buena Park and as far east as the area of San Bernardino. The phone remained in California until August 12, 2018. This area was consistent with information previously obtained as to the half way point where the transporters for this organization picked up loads of narcotics.

The ping data reported that the phone was again traveling north on August 13, 2018, specifically into Oregon. Based on training and experience, as well as the on-going investigation into CD2's activities, TFO Brazeau knew that driving straight through multiple states with limited stops and only staying at the final destination for 2-3 days is again consistent behavior with narcotics traffickers/couriers.

Plea Agreement - 16

TFO Brazeau continued to monitor the ping data as it reported the phone traveling north through Oregon. As a result, that same day (August 13, 2018) members of the SWSSTF deployed to the area of Biggs, Oregon, to observe the likely vehicle that CD2 was driving. TFO Brazeau was able to personally observe the vehicle, a 2005 gold Acura bearing California plate 8APL623, and confirm that CD2 was a passenger at approximately 5:19 p.m.

Based upon the ongoing investigation and the belief that the vehicle was likely to contain narcotics, TFO Brazeau arranged with Kennewick Police K9 Officer Isaac Merkl to conduct an investigative stop on the vehicle in the area of Kennewick, Washington. Officer Merkl stopped the vehicle without incident. Officer Brad Kohn assisted. The occupants of the vehicle were identified as CD2, a passenger and a child. Officer Merkl advised their statements were inconsistent with the monitored ping location data. During the course of the traffic stop, it was discovered that there was not a lawful driver present and CD2 had a misdemeanor warrant for his/her arrest. They were both taken into custody.

Officer Merkl impounded the vehicle and applied for, and was granted, a state search warrant for the vehicle. On August 14, 2018 Officer Merkl, with the assistance of members of the SWSSTF, executed the search of the vehicle at the Kennewick Police Department. Inside of the trunk of the vehicle, officers located three large grocery-style bags and a duffle bag. The duffle bag contained three Tupperware containers with suspected methamphetamine. Co-located inside the duffle bag was a letter addressed to CD2. One grocery bag contained twelve wrapped cylinders, which weighed about one pound each, of suspected methamphetamine. The other two grocery bags each contained nine cylinders of suspected methamphetamine that were consistent with the other bag. A field test

Plea Agreement - 17

was conducted on a sample of suspected methamphetamine. It returned presumptive positive.

Co-located inside the trunk with the bags of methamphetamine, was luggage and inside CD2's bag was a user quantity of methamphetamine, about $7,000 cash, and an unused glass methamphetamine pipe. The drugs were sent to the lab and returned to be approximately *32 pounds* of 99% pure methamphetamine.

### *Interview of CD2*

On August 14, 2018, TFO Brazeau conducted an interview with CD2 regarding the Defendant and the DTO. CD2 was arrested and charged based upon the aforementioned traffic stop. CD2 was not in the United States legally and had no prior felony convictions. TFO Brazeau met with CD2 on several occasions for the purpose of interviewing CD2 as to their involvement and knowledge of the DTO. The following is a summary only of the information provided.

CD2 identified a photo of the Defendant, absent any identifiers, as "TIO". CD2 admitted to being involved in narcotics trafficking for "TIO" since August 2017. When CD2 was being considered to work for the DTO, the Defendant gathered personal information about CD2's family, such as their names and addresses. CD2 has not seen that information since it was passed to the Defendant.

CD2 reported she/he initially was involved in the packaging of the narcotics. This primarily involved methamphetamine and heroin. Eventually, CD2 began to assist in the transportation of narcotics to the Spokane, WA area. The bulk drugs were kept in a storage unit that was paid for by the Defendant prior to transport. CD2 delivered to a small specific group of people in Spokane. A few of these people went by the monikers of "CHICA", "FLACO", "LUKE",

Plea Agreement - 18

and "PRIMERA".  As previously confirmed through various records and other witness identification  as well as the positive identification of CD2, "CHICA" was confirmed to be Co-Defendant Villa (VILLA);  "FLACO" was identified as Albert Welling (WELLING); "LUKE" was identified as Aryn Jennen (JENNEN); and "PRIMERA" was confirmed to be Co-Defendant Hamilton (HAMILTON).

CD2 added that JENNEN would place orders about every other day. They were usually for about one pound of methamphetamine and 3-6 ounces of heroin. CD2 acknowledged delivering drugs to HAMILTON at her residence a few times. CD2 admitted to delivering narcotics to all four numerous times under the direction of the Defendant.

Around mid-February 2018, CD2 reported that he/she began to manage and organize the deliveries to Spokane, WA. CD2 was sent the contact numbers for the Spokane customers directly from LEAL PARRA. This was later confirmed from the download of CD2's phone.  CD2 reported he/she would take orders from the Spokane clients and arrange with LEAL PARRA to fill the orders. Different couriers would transport the drugs to Spokane from the Tri-Cities almost daily. A review of the cell phone exploitation records by Staff Operations Specialist Sonnefeld revealed that a telephone number associated with the Defendant sent CD2, via text, the telephone numbers associated with the Spokane clients. CD2 also identified Co-Defendant ORTEGA as making runs for the Defendant.

CD2 advised she/he made two trips to the Phoenix, AZ area and three trips to the Los Angeles, CA area to pick up drugs for the Defendant. CD2 was provided $25,000-$50,000 to bring south and used that money to pay for up to

Plea Agreement - 19

twenty pounds of drugs to bring back. CD2 transported the drugs back to the Tri-Cities. The Defendant then paid CD2 $6,000-$8,000 for these trips.

CD2 personally met with the Defendant 8-10 times. Typically, CD2 met with other members of the DTO on behalf of the Defendant to include Co-Defendant ESCARCIGA. CD2 primarily communicated with the Defendant via text and telephone. CD2 further confirmed that the meeting in the Craft Warehouse parking lot, witnessed by TFO Brazeau and detailed earlier, on May 16, 2018 was with the Defendant and that either drugs or money was exchanged during the meet.

*Arrest and Interview of Cooperating Defendant 4 (CD4)*

In September and October 2017, Spokane Patrol Anti-Crime Team made controlled purchases of methamphetamine and heroin from CD4 using a confidential informant. As a result, a state search warrant was obtained for CD4's vehicle, storage unit, and residence. On November 5, 2017, the search warrants were served. Law enforcement officers recovered about 1/3 pound of methamphetamine and a golf ball size piece of heroin from the vehicle. A Highpoint .40cal handgun and a bullet proof vest were recovered from the storage unit.

On July 16, 2019 TFO Brazeau conducted an interview with a person involved with the LEAL PARRA DTO (hereinafter referred to as CD4). CD4 was in prison based upon a state felony drug arrest. CD4 is a United States citizen and had no prior felony convictions. CD4 agreed to cooperate with investigators for consideration of not being indicted in the criminal conspiracy. No promises were made to CD4.

CD4 advised they began to deal drugs sometime in 2016. CD4 never personally met the source of supply for the drugs. CD4 stated they communicated

Plea Agreement - 20

with the source of supply via Facebook messenger or phone. CD4 ordered specific amounts of drugs from the source of supply and couriers would deliver the drugs. CD4 was usually supplied about one pound of methamphetamine and four ounces of heroin a few times a week. CD4 was told by the source of supply that the couriers were coming from Pasco, WA. CD4 identified by photograph CD1, CD2, and Co- Defendant Ortega as couriers for CD4's narcotics source of supply from the Tri-Cities, WA.

*Arrest and Interview of Cooperating Defendant 5 (CD5)*

CD5 was identified as a methamphetamine source of supply and DEA Spokane was able to introduce an Undercover into CD5 to purchase approximately 1.5 pounds of methamphetamine. After these controlled buys and his arrest, DEA learned he was being supplied by the LEAL PARRA DTO.

On September 16, 2019 TFO Brazeau conducted an interview with a person involved with the LEAL PARRA DTO (hereinafter referred to as CD5). CD5 is a United States citizen and is currently under federal indictment for a related rug charge based upon the above referenced arrest. CD5 agreed to cooperate with investigators for consideration on his current case and for new charges related to his involvement with the LEAL PARRA DTO. No promises were made to CD5.

CD5 advised they began selling drugs around 2016. CD5 identified their source of supply as a person known as "CEASAR" but also stated that some of his the drug couriers/runners called him "JULIO". According to "CAESAR" the drugs were delivered to CD5 from Pasco, WA.[3] CD5 primarily dealt heroin and

3 Since this identification of the Defendant utilizing his middle name of Caesar, two additional Defendants have come forward and identified the Defendant as utilizing the name "Caesar" rather than Julio.

Plea Agreement - 21

methamphetamine. "CAESAR" provided CD5 with about 2-6 ounces of heroin a day and ½ pound of methamphetamine a week. "CAESAR" was CD5's only source of supply for drugs from 2016 – 2018.

During the first drug delivery to CD5, one of the couriers took a photo of CD5's driver's license. CD5 thought that the photo was going to be turned over to "CAESAR". CD5 has not seen that photo since it was taken. CD5 advised he/she met "CAESAR" in person one time around the summer of 2017. CD5 was shown a photo, absent any identifiers, of the Defendant, LEAL PARRA. CD5 identified the photo as "CAESAR".

CD5 also advised that "CAESAR" had a middle man that facilitated the drug orders and shipments. The middle man's nickname was "Blue". CD5 also stated that "CAESAR" also had a courier that delivered the drugs nicknamed "B". CD5 was shown a photo, absent any identifiers, of ESCARCIGA. CD5 identified the photo as "Blue". CD5 was shown a photo, absent any identifiers, of the Co-Defendant ORTEGA.  CD5 identified the photo as "B".

*Interview of Cooperating Defendant 6 (CD6)*

CD6 was identified as a distributor for the DTO and has agreed to cooperate in exchange for sentencing consideration.  CD6 advised they began selling drugs, supplied by the organization, for the last two years (2017-2019). CD6 was contacted by a subject who identified themselves as "CEASAR" in 2017.  CEASAR advised that CD6 was highly recommended and CEASAR wanted CD6 to move a lot of product for him.  CD6 agreed and they met in person to discuss the specifics.  After that first in person meeting, CD6 communicated via telephone with CEASAR but dealt directly with multiple couriers who worked for CEASAR.

Plea Agreement - 22

CD6 was supplied both methamphetamine and heroin by CEASAR and would re-up their supply every week. CD6 was typically supplied 1-2 pounds of methamphetamine every week and several pieces of heroin. CD6 would contact CESAR directly to place the order, although sometimes utilized his middle man identified as "Junior" or "Blue." Blue was positively identified as the Co-Defendant ESCARCIGA. CD6 advised that after the arrests of CD1and CD2, operations were stopped for about one month. CD6 advised that "Blue" contacted CD6 and advised they were up and running again, so the drug supply resumed.

CD6 was shown a series of photographs and positively identified CD1, CD2, CD3, Bianca ORTEGA, and ESCARCIGA as all working for the LEAL PARRA DTO. CD6 also identified the Defendant, Leal PARRA as "CEASAR."

*Interview of Cooperating Defendant 7 (CD7)*

CD7 was identified as a distributor for the DTO and has agreed to cooperate in exchange for sentencing consideration. CD7 advised they were introduced to "CEASAR" later identified as the Defendant, by Aren JENNEN. The Defendant was introduced to CD7 as a source of supply of methamphetamine during the summer of 2017. CD7 advised after CD7 was put into contact with CEASAR (the Defendant), CD7 was supplied pound quantities of methamphetamine weekly through various couriers until December of 2019.

CD advised they communicated with "CEASAR" via cellular telephone to give their orders. However, CD7 advised they usually worked through a "middleman" known to CD7 as "Blue", later identified as Co-Defendant ESCARCIGA. CD7 would send the orders to CEASAR or Blue and a courier would later deliver the drugs to CD7.

Plea Agreement - 23

CD7 was shown a series of photographs and positively identified CD1, CD2, CD3, Bianca ORTEGA, and ESCARCIGA as all working for the PARRA DTO. CD7 also identified the Defendant as "CEASAR."

*Summary of Evidence seized from various cell phones*

FBI Staff Operations Specialist (SOS) Matthew Sonnefeld reviewed the numerous cell phone data extractions and various subscriber, toll records and pen data for numerous phones to include multiple phones tied directly to the Defendant. For example, review of the text message communications and contacts lists from phones seized directly from CD1, CW1, CD2, and CD3, listed five telephone numbers for "Tio", the Defendant. Through the exploitation of telephone records, an additional three phones, for a total of 8 phones, were identified as being used by the Defendant during the time period of the Conspiracy.

Call pattern analysis, subscriber records, bank records, public data records and pen data in addition to witness statements, directly tied these fifteen phones to the Defendant. Additionally, these 15 phones during period of time within the conspiracy were in direct communications with phones confirmed to be used by Escarciga, Hamilton, Villa, CD1, CD2, CD3 and other subjects of investigation to include Reynaldo MUNOZ. These 15 phones were also in contact with numerous Mexican numbers that have been confirmed to be utilized in multiple drug investigations throughout the United States.

Moreover, call pattern analysis, subscriber records, bank records, public data records and pen data in addition to witness statements, directly tied a total of fifteen phones to the Defendant. Additionally, these 15 phones during period of time within the conspiracy were in direct communications with phones confirmed to be used by ESCARCIGA, HAMILTON, VILLA, CD1, CD2, CD3 and the

Plea Agreement - 24

Defendant.  These 15 phones were also in contact with numerous Mexican numbers that have been confirmed to be utilized in multiple drug investigations throughout the United States.

A review of text messages seized from the various phones confirm drug coordination between the Defendant, ESCARCIGA, CD1, CD2 and CD3 during the relevant time periods which includes but is not limited to the following type of evidence: bank account information for deposits directed by the Defendant; addresses in Phoenix provided by the Defendant; direction by the Defendant to the transporters as to where to go to pick up the supply; specific drug orders from several Spokane distributors to include VILLA and HAMILTON communicated to the Defendant with corresponding orders to the ORTEGA, ESCARCIGA; CD1, CD2 and CD3; and contact lists provided by the Defendant for all the Spokane distributors that is cross corroborated by phone records.

In sum, there are voluminous records which corroborate the phone evidence seized in this case as well as the testimony of Cooperating Defendants.

8.    The United States Agrees Not to File Additional Charges:

The United States agrees not to bring any additional charges against the Defendant based upon information in its possession at the time of this Plea Agreement and arising out of Defendant's conduct involving illegal activity charged in Indictment 4:19-CR-06061-SAB, unless the Defendant breaches this Plea Agreement.

9.    United States Sentencing Guideline Calculations:

The Defendant understands and acknowledges that the United States Sentencing Guidelines (hereinafter "USSG") are applicable to this case and that the Court will determine the Defendant's applicable sentencing guideline range at the time of sentencing.

Plea Agreement - 25

      (a).   Base Offense Level and application of Relevant Conduct:

The Government and Defendant agree and stipulate that more than 4.5 kilograms of actual methamphetamine[4] was distributed in furtherance of the criminal activity jointly undertaken by the Defendant and his co-conspirators; this amount was within the scope of the Defendant's agreement; this amount was reasonably foreseeable to this Defendant in connection with the conspiracy; and this Defendant's relevant conduct for sentencing purposes should be calculated based upon this amount, pursuant to USSG §1B1.3.

Thus, the Government and Defendant agree that the base offense level for Count 1, is 38. *See* USSG §2D1.1(c)(1) and Commentary 8(b).

      (b)   Role in the Offense:

The parties agree that based upon his role in the offense as a manager/supervisor, he should receive a two level enhancement pursuant to USSG § 3B1.2.

      (c).   The parties further agree that no other adjustments or enhancements should be applied.

      (d).   Acceptance of Responsibility:

If the Defendant pleads guilty and demonstrates a recognition and an affirmative acceptance of personal responsibility for the criminal conduct; provides complete and accurate information during the sentencing process; does not commit any obstructive conduct; accepts this Plea Agreement; and enters a plea of guilty no later than the next Pre-Trial Conference, the United States will move for a three (3) level downward adjustment in the offense level for the

---

[4] As noted above, the Defendant also had involvement in the distribution of heroin. However, the calculation of those amounts would lead to the same applicable offense level.

Plea Agreement - 26

Defendant's timely acceptance of responsibility, pursuant to USSG §3E1.1(a) and (b).

The Defendant and the United States agree that the United States may at its option and upon written notice to the Defendant, not recommend a three (3) level downward reduction for acceptance of responsibility if, prior to the imposition of sentence, the Defendant is charged or convicted of any criminal offense whatsoever or if the Defendant tests positive for any controlled substance. Furthermore, the Defendant agrees to pay the $100 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington, at or before sentencing or as otherwise authorized in Paragraph 16.

        (d).   <u>Criminal History</u>:

The United States and the Defendant understand that the Defendant's criminal history computation is tentative and that ultimately the Defendant's criminal history category will be determined by the Court after review of the Presentence Investigative Report. The United States and the Defendant have made no agreement and make no representations as to the criminal history category, which shall be determined after the Presentence Investigation Report is completed.

        10.   <u>Safety Valve</u>:

The United States and the Defendant agree that the Defendant is not eligible for the safety valve provisions of 18 U.S.C. § 3553(f) and USSG §5C1.2 or the First Step Act.

        11.   <u>Departures</u>:

The Defendant intends to request downward departures and variances from the sentencing guidelines. The United States reserves its right to oppose any downward departure.

Plea Agreement - 27

12.    <u>Length of Incarceration</u>:

The parties are free to argue for any lawful sentence.

13.    <u>Criminal Fine</u>:

In light of the forfeiture provisions contained in this agreement, the United States agrees not to seek any additional monetary fine.

14.    <u>Supervised Release</u>:

The parties recommend the Court impose a 5-year term of supervised release, to include the following special conditions, in addition to the standard conditions of supervised release:

(1)    that the Defendant's person, residence, office, vehicle, and belongings are subject to search at the direction of the Probation Office; and

(2)    that the Defendant have no contact with any witnesses or Co-defendants in this cause number.

15.    <u>Mandatory Special Penalty Assessment</u>:

The Defendant agrees to pay the $100 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington, at or before sentencing or in accordance with section 16, pursuant to 18 U.S.C. § 3013 and shall provide a receipt from the Clerk to the United States before sentencing as proof of this payment.

16.    <u>Payments While Incarcerated</u>:

If the Defendant lacks the financial resources to pay the monetary obligations imposed by the Court, the Defendant agrees to earn the money to pay toward these obligations by participating in the Bureau of Prisons' Inmate Financial Responsibility Program.

Plea Agreement - 28

17.   Forfeiture:

The parties agree forfeiture applies.  *See* 21 U.S.C. § 853. With respect to forfeiture, the parties agree to the following:

(a)   Money Judgment

Defendant agrees to the entry of a forfeiture money judgment in the amount of $50,000 pursuant to 18 U.S.C. § 853(a)(1) and Fed. R. Crim. P. 32.2. The forfeiture money judgment represents the amount of proceeds Defendant obtained, directly or indirectly, as the result of his criminal offenses. The United States will not seek to forfeit proceeds in an amount exceeding what Defendant actually obtained as a result of his offense conduct.  *See Honeycutt v. U.S.*, 137 S. Ct. 1626 (2017).

(b)   Substitute Property

Defendant understands the United States may seek for Defendant to forfeit substitute property in satisfaction of the money judgment if the United States can establish the following regarding the above-described property (*i.e.*, the money judgment): a) it cannot be located upon the exercise of due diligence; b) it has been transferred or sold to, or deposited with, a third party; c) it has been placed beyond the Court's jurisdiction; d) it has substantially diminished in value; e) it has been commingled with other property and cannot be divided without difficulty. *See* 18 U.S.C. § 982(b)(1); 21 U.S.C. § 853(p).

(c)   Collection of Money Judgment

Defendant agrees to pay $10,000 per year for five years, beginning in 2021, to the United States in satisfaction of the forfeiture money judgment. If the Defendant is current in his payments, the United States agrees to not seek collection of the money judgment against any available assets of the Defendant. In the event the Defendant defaults on his yearly payment, the United States may

Plea Agreement - 29

fully engage in all available collection methods and/or forfeiture of substitute property as permissible by law to collect the outstanding balance of the money judgment.

18.    <u>Additional Violations of Law Can Void Plea Agreement</u>:

The Defendant and the United States agree that the United States may at its option and upon written notice to the Defendant, withdraw from this Plea Agreement or modify its recommendation for sentence if, prior to the imposition of sentence, the Defendant is charged or convicted of any criminal offense whatsoever or if the Defendant tests positive for any controlled substance.

19.    <u>Appeal Rights</u>:

In return for the concessions that the United States has made in this Plea Agreement, the Defendant agrees to waive his right to appeal the conviction and sentence if the Court imposes a prison term no higher than the high end of the applicable guideline range, as determined by the Court, and imposes no more than 5 years supervised release. In addition, Defendant expressly waives his right to appeal the entry of a forfeiture money judgment if the Court orders forfeiture no greater than the amount agreed to by the parties herein. Defendant further expressly waives his right to file any post-conviction motion attacking his/her conviction and sentence, including a motion pursuant to 28 U.S.C. § 2255, except one based upon ineffective assistance of counsel based on information not now known by Defendant and which, in the exercise of due diligence, could not be known by Defendant by the time the Court imposes the sentence. Should the Defendant successfully move to withdraw from this Plea Agreement or should the Defendant's conviction on Count One of the Indictment be dismissed, set aside, vacated, or reversed, the Plea Agreement shall become null and void; the United States may move to reinstate all counts of Indictment 4:19-CR-06061-

Plea Agreement - 30

SAB; and the United States may prosecute the Defendant on all available charges involving or arising out of Indictment 4:19-CR-06061-SAB.  Nothing in this Plea Agreement shall preclude the United States from opposing any post-conviction motion for a reduction of sentence or other attack of the conviction or sentence, including, but not limited to, proceedings pursuant to 28 U.S.C. § 2255 (writ of habeas corpus).

20.    Integration Clause:

The United States and the Defendant acknowledge that this document constitutes the entire Plea Agreement between the United States and the Defendant, and no other promises, agreements, or conditions exist between the United States and the Defendant concerning the resolution of the case.  This Plea Agreement is binding only upon the United States Attorney's Office for the Eastern District of Washington, and cannot bind other federal, state or local authorities.  The United States and the Defendant agree that this agreement cannot be modified except in a writing that is signed by the United States and the Defendant.

Approvals and Signature

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.

Joseph H. Harrington
Acting United States Attorney

*Stephanie Van Marter*
Stephanie Van Marter                              03/02/2021
Assistant U.S. Attorney                           Date

Plea Agreement - 31

I have read this Plea Agreement and have carefully reviewed and discussed every part of the agreement with my attorney. I understand and voluntarily enter into this Plea Agreement. Furthermore, I have consulted with my attorney about my rights, I understand those rights, and I am satisfied with the representation of my attorney in this case. My attorney has advised me that by pleading guilty to the charge relevant to this Plea Agreement, as of this date deportation appears to be a virtual certainty. No other promises or inducements have been made to me, other than those contained in this Plea Agreement and no one has threatened or forced me in any way to enter into this Plea Agreement. I am agreeing to plead guilty because I am guilty.

_____     2-27-21
JULIO LEAL PARRA                               Date
Defendant

I have read the Plea Agreement and have discussed the contents of the agreement with my client. The Plea Agreement accurately and completely sets forth the entirety of the agreement between the parties. I concur in my client's decision to plead guilty as set forth in the Plea Agreement. I have further advised my client by pleading guilty to the charge relevant to this Plea Agreement, as of this date deportation appears to be a virtual certainty. There is no legal reason why the Court should not accept the Defendant's plea of guilty.

_____     2/27/2021
Chris Black                                          Date
Attorney for the Defendant

Plea Agreement - 32